---

### In re WARD.

#### (District Court, D. New Jersey. August 15, 1911.)

BANKRUPTCY (§ 91*)—INVOLUNTARY PROCEEDINGS—EVIDENCE—INSANITY.

> Evidence considered, and *held* to show that an alleged bankrupt was insane at the time of his transfer of property charged as the act of bankruptcy and at the time of the contracting of many of the debts necessary to be taken into account to establish his insolvency.

> [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 113; Dec. Dig. § 91.*]

In the matter of William R. Ward, alleged bankrupt. On exceptions to report of special master. Exceptions sustained, and petition dismissed.

Decree affirmed, 194 Fed. 89.

See, also, 161 Fed. 755; 194 Fed. 179.

Robert R. Howard and Edward A. & W. T. Day, for petitioning creditors.

Riker & Riker, for Merchants' Nat. Bank of Newark, intervening creditor.

Vredenburgh, Wall & Carey, for guardians of alleged bankrupt.

RELLSTAB, District Judge. As I view the matter, I think it is necessary for me to take only one of the points into consideration. It seems to me that the case can be determined upon the question of the alleged bankrupt's sanity, and, as I have reached a definite conviction upon that subject, I will arrest the further argument on the respondent's objections to the master's report by saying that in my judgment this alleged bankrupt was not sane at the time he committed this alleged act of bankruptcy.

There is only one act of bankruptcy alleged, that he fraudulently transferred his real estate. If he was insane at that time, of course,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that ends these bankruptcy proceedings, as an insane person cannot commit an act of bankruptcy. Furthermore, the question of sanity affects the one of insolvency; for it is very clear from the master's findings that, in order to establish insolvency, it is necessary: First, to give force and validity to many of the claims which have their origin in a period during which the inquisition issued by the state Court of Chancery found that Ward was insane; and, second, that the transferred property should not be treated as part of the assets. Of course, on the question of solvency as affecting the jurisdiction of the bankruptcy court, the value of the property transferred is not to be taken into consideration; but as this property would go to the trustee's hands in the event of adjudication, the result would be that, at the end of the administration, the assets would exceed the debts. A finding of insanity, therefore, necessarily ends the bankruptcy proceedings.

Ward was adjudged a lunatic of unsound mind, incapable of the government of himself or his property, and that he had been so and without lucid intervals. The alleged act of bankruptcy was very recent before the filing of the creditors' petition, and upon the inquisition referred to Ward was found to be insane for a period extending back of the time since which a number of the claims filed against the bankrupt were contracted, and without which claims even a prima facie case of insolvency could not be established. What weight shall be given these findings on the status of the alleged bankrupt during the time when such obligations were incurred and the transfer of such property was made? Being collateral to the present proceedings, perhaps the status so declared is not binding on this court; but such findings are at least prima facie, and at the least the burden is upon the petitioning creditors to show that such indebtedness was incurred and such alleged act of bankruptcy was committed during lucid intervals, or that such findings of insanity were erroneous. The master held otherwise. In addition to such findings, we have the testimony of medical men of standing in their profession, one a medical practitioner, not a specialist, who knew the alleged bankrupt all his life, who had attended him professionally when he lived in his neighborhood; another, also a practitioner, who lived near the bankrupt at his present residence, and who had been called in to attend the family, and who in that way and as a neighbor became acquainted with him. Three others are specialists—alienists—one of whom has achieved eminence as an expert. Two of these specialists had him under surveillance. He was at their institution. They said that within a week after his admission, as I remember their testimony, they had diagnosed his ailment as one of manic depressive insanity. The other one did not have the same opportunity of observation, but he gives his opinion in response to hypothetical questions.

Now, of course, these alienists may have come into the case as advocates. It so often happens that experts present that attitude. It may be because of this that our own profession is loath to adopt their views unless some corroboration is found in other testimony. Perhaps we have gone too far in that particular, and are not giving to the learning and standing of these specialists that credence and weight that, as a

profession, they are entitled to. In this very case I began the study of the testimony with a mental attitude requiring lay corroboration of the expert testimony. I gave the last four days to a study of the record, and I approached the examination with the expectation that the case could be disposed of by merely ascertaining whether there was a rational basis to support the master's findings. Certainly I would not attempt to set aside the master's findings upon a mere doubt of their correctness. If the matter hung in the balance, I should be constrained to set my own doubts aside and accept the conclusion of the master, as he alone had the benefit of a personal scrutiny of the witnesses when testifying. I had not progressed very far in the reading of the testimony bearing upon the question of insanity, however, before I was forced to concede that there was a great deal in the case to support the opinion of the medical gentlemen that this man was insane, and had been for a number of years. To my mind, regardless of where the burden of proof lies, there is no escape from such conclusion.

Assuming that the legal standard of insanity is different from the medical standard of to-day, I unhesitatingly accept the test quoted in the briefs of petitioner's counsel, said to be the one adopted by the courts of New Jersey to determine mental capacity, viz., did the person whose acts are challenged possess sufficient mind to understand in a reasonable manner the nature and effect of his acts? The testimony is in a large measure conflicting. Some who conversed and transacted business with Ward saw no reason to doubt his sanity. I have no doubt that some of the men connected with the banks, when they transacted business with him, thought they were dealing with a sane man.

The conclusion that I have reached does not in any manner impugn either their motives or intelligence; but those transactions, after all, occupied but a very little time. They were but instances in a bank president's or cashier's busy life. Mr. Ward was well known in banking circles, and when he presented himself with good collateral there was not that same reason for scrutiny as in the case of a mere acquaintance or stranger. So that I have no doubt whatever that, in all of the specific instances mentioned, these men firmly believed that they were dealing with a sane man. But in manic depression the *disease* is not always manifest to men of even more than average intelligence and observation. This *disease* is progressive, and perhaps incurable; but because it is incurable it does not follow that it may not be so pronounced as to impair the reasoning faculties beyond legal responsibility and yet fail to disclose it to the ordinary observer. We are told that the peculiar manifestations of this *disease* are alternating mental exaltation and depression, and that the conduct of the afflicted one is different according as the one or the other manifestation is present and as it advances or recedes. His intimates, those who lived in his neighborhood and who saw him frequently as he passed from and to his house, those who had frequent occasion to reflect upon his conduct in the various offices and business places he attended, would be more apt to form a correct judgment of the man's mental condition than the casual business acquaintance. True, it is

the *unusual* that attracts; but "unusual" is a relative expression, and one must be familiar with the usual to say what is unusual. What to the casual acquaintance might be strange and unusual conduct, to the more intimate acquaintance would be but normal. What to the former might appear to be but eccentricities, might to the latter be abnormal and intensely irrational. Of course, those who were in closest touch with Ward are members of his immediate family—wife, children, domestics—and these would be best capable of determining what was unusual in his conduct. True, these immediate relations have a decided interest in the question of his sanity, one that is not to be overlooked in weighing their testimony; but their evidence of abnormal actions is in the main supported by witnesses who seemingly have no personal interest in giving their testimony, and these give voice to a series of acts at different times and places, under varying conditions, which prove to my mind that Ward was suffering from a mental disease, with manifestations more pronounced at some times than at others, and which conform to the portrait given by the alienists of one who is afflicted with manic depressive insanity, and not one who is merely suffering from neurasthenia.

Here was a man who had reached a time in life when habits are generally fixed—over 50 years of age. Those of us who have been striving to change them between 40 and 50 know what a task that is. Here is one who had been trained to routine work. He had been a bank clerk many years. The horizon of his activity was not far reaching. His was a narrow walk in life, but it was one that trained and disciplined him to methods of carefulness. Whatever might have been his earlier tendencies to impulsiveness and volubility, here was a training tending to method and caution. With the acquisition of wealth from his parents, he, in 1896 or 1897, leaves that treadmill life. His environment is now entirely different, but he enters it a gentleman, prudent, reticent, as a result of his business career, and so continues until about the year of 1900, when a marked change takes place noticeable at first only to his family and those who had an intimate acquaintance. With wealth to invest, we find him for a time making careful and safe investments, consulting with his brother. After 1900, however, he not only did not so consult with him, but was adverse to telling him how he was investing his money. He became largely indebted in making investments, but until lately had something substantial to show for it. Before 1906 his indebtedness, while large, could not be said to be the result of bad speculation, but rather in speculating, and his loans were made upon negotiable collateral which had been purchased by him upon such loans. Gradually from 1900 his conduct changes. He is no longer the quiet reticent man, but progressively and alternately very voluable, loud, boisterous, irrational; no longer economical to closeness, but extravagant oft to the extent of wastefulness; no longer demeaning himself gentlemanly, but obtruding himself upon others, arresting people on the streets by hollering at them, whom after he has succeeded in attracting their attention, he passes by as if nothing unusual had happened and entertains very exalted notions of his importance and exaggerated conceptions of his

financial ability. Latterly Ward's conduct in places which he frequently visits is pronounced a nuisance. A reputable attorney who had seen and talked with him frequently declines to administer an oath to him on the ground of his mental incompetency, and upon one occasion he is found upon a train actually hugging unknown women. He is easily persuaded to engage in enterprises of which he knew nothing and for which he had no training, and to guarantee loans and purchases in large amounts, in some of which he could have but a speculative interest, and in others no apparent substantial interest whatever.

The influence which one Sherrer, with whom he became acquainted in 1906, exercises over Ward would be impossible of comprehension, if he is to be considered as a rational being. By him he is easily persuaded into speculations without adequate investigation. Ward's ready cash seems to be at the command of Sherrer, who goes with him on journeys of pleasure and recreation, having Ward's pocketbook and money in his pocket. In the enterprises in which Sherrer had an interest, or is now obtaining an interest, Ward is the money man, to which he gives up his money and credit very easily, and with whom he is on very confidential terms. He shows no hesitancy in guaranteeing by indorsement or otherwise large sums of money which are at once absorbed in Sherrer's concerns, and from which others obtain an immediate benefit. The striking part of Ward's commercial transactions from the time that Sherrer enters into his life is his fatuous yielding to Sherrer and others of his money and credit, his childlike reliance upon Sherrer, and his failure to observe even the ordinary business precautions, including the taking of vouchers in making such advances, and his slipshod manner of keeping his bank accounts. While before 1900 everything was kept in order as might be expected of one trained in banking, now everything is chaotic. The record bristles with evidence of Ward's abnormal conduct, given by those who had an intimate acquaintance with him, or who, having more than a casual acquaintance, had their attention directed to him by his extraordinary conduct; the foregoing being specifically referred to not as the most striking, but as coming readily to mind. Without the obligations incurred after Ward comes under the influence of Sherrer, no prima facie case of insolvency could be established. These were all incurred during the period covered by the state inquisition's finding of insanity, and during the period when Ward's irrational conduct is the most pronounced.

Now, it would be absurd to hold that any one of the specific instances of irrationality is sufficient upon which to found a judgment of insanity. But we do not make up our minds on that question on specific instances. After all, it is the pronouncement of our minds upon the whole conduct, comparing the unusual with the normal, looking for a rational explanation for the difference.

This form of mental *disease* is progressive, and, as I read the testimony of the many irrational acts of this bankrupt, I am unable to yield assent to the proposition that they evidence at most but eccentricities or enlarged self-esteem, but am constrained to the conclusion

that they support and corroborate the opinions of the experts that they are manifestations of a mental disorder of such serious character as to make him irresponsible for his contracts.

To my mind, the conclusion is irresistible that at the time that Ward committed the alleged act of bankruptcy—transfer of property—he was not capable of understanding in a reasonable manner the nature and consequence of such act, and that he was then, and had been for some time previous, laboring under a mental *disease* that made him totally irresponsible for his contracts.

The motion to confirm the master's report is denied, and the fifth and sixth amended exceptions to such report are sustained. A decree may be entered accordingly.